DONAGHEY *v.* FONES BROTHERS HARDWARE COMPANY.

Opinion delivered October 25, 1926.

1. EMINENT DOMAIN—CHANGE IN BRIDGE APPROACH—DAMAGES.—
   Evidence *held* to sustain a finding that a change in the approach
   of a bridge damaged property used in a wholesale business to
   the extent of $27,500.

2. EMINENT DOMAIN—CHANGE IN BRIDGE APPROACH—DAMAGES.—The
   owners of a building are entitled to recover the depreciation in
   value of the building caused by a change in the approaches thereto,
   regardless of what use the building might be put to by con-
   solidating it with adjoining buildings.

Appeal from Pulaski Chancery Court; *John E.
Martineau*, Chancellor; affirmed.

*Moore, Smith, Moore & Trieber,* for appellant.

*Robinson, House & Moses,* for appellee.

McCULLOCH, C. J. The lot and building involved
in this controversy are located in the city of Little Rock,
at the foot of Main Street, at the intersection of Main
and Water streets, and abut on the west side of the new
Main Street bridge constructed by the Broadway-Main
Street Bridge District of Pulaski County. There was
an assessment of benefits and damages, and the list was
filed in May, 1920. The owner of the building claims
damages considerably in excess of the amount awarded
by the assessors, and this action was instituted in apt
time by appellees against the district for a review of
the assessment of damages and for recovery of the
amount claimed.

The property consists of a lot having a frontage of
150 feet on Main Street and a depth of 124.5 feet, on
which there is a three-story and basement brick building,
occupied, up to the time of the construction of the bridge,
as a wholesale hardware store. The facts of the case,
with respect to the location and condition of the build-
ing at the time the new bridge was constructed in replace-
ment of the old bridge and the changes brought about by
constructing the new bridge and its approach, are set
forth with accuracy by counsel for appellant in their

brief, and we adopt the same as substantially correct for the purpose of disposing of the case on this appeal. The statement is as follows:

"Prior to the construction of the new bridge, the old county free bridge and its approach stood at the foot of Main Street in front of and east of the Fones property. The approach to the old bridge began somewhat south of the intersection of the Fones and Lincoln buildings, and its grade ascended toward the north to where the old bridge actually began, a distance of about 54 feet north of the south line of the Lincoln property. At the south end of the Fones building, only a few feet north of the north wall of the Lincoln building, there were double doors opening onto Main Street, the south of which was used for shipping purposes. In front of these doors was a sidewalk 12 feet wide, in front, to the east of which lay Main Street, there being, on account of the approach to the bridge, a slope from the middle of the street west toward the curb of the sidewalk. For a space of about 25 feet north and south, in front of the doors, the grade was sufficiently level to make it possible to back trucks up to the curb for shipping purposes.

"The west side of the old steel bridge was about 30 feet from the east property line of the Fones building. Between the old bridge and the curb of the sidewalk in front of the Fones building there was originally a roadway 17½ feet wide, leading north along and parallel to the sidewalk to the north end of the building. There was attached to the north wall, at the northeast corner of the Fones building, a wooden platform, inclosed with tin sides and roof. This shed abutted upon the railroad tracks, and was used for the receiving and shipment of carload freight, there being doors cut into the wall of the basement of the building so that the shed communicated with the basement floor as well as with the elevator at the north wall. * * * It will be seen that the shed had a double door cut into its east side, through which shipments were also loaded into trucks and wagons. The old bridge was built of steel girders,

and the lower part of Main Street under it and east of the north part of the Fones building was open, it being possible to drive trucks and wagons from the Fones building clean under the bridge to the east side of Main Street, east of the bridge, to what was known as the Wait building, a brick warehouse located on north Main Street north of Elm and east of the bridge.

"The 17½-foot roadway between the curb of the Fones property and the west side of the old bridge was used for the passage of trucks down to the north end of the Fones building, to be loaded at the east doors in the shed. Trucks would be driven down this roadway, swung or turned east under the bridge, and then backed up to the shed entrance for loading. It was testified that there was room along the 17½-foot roadway for two trucks to pass, one going north and the other south up the hill. As stated, immediately in front of the south doors of the Fones building the street running north and south, although on grade, was sufficiently level for a space of about 25 feet to back trucks into the curb, to be loaded from these doors. A few feet north of the south doors, however, the 17½-foot roadway began a steep slope toward the north. On reaching the north end of the building the grade decreased, there being a fairly level space in front of the shed for a space of ten or fifteen feet north and south; but the average grade of the roadway between the south doors of the building and the north or shed entrance was 13½ per cent. The roadway itself was macadam.    *    *    *

"The method adopted by the Fones Bros. Hardware Company of operating their business in the old location was as follows, according to the testimony of appellee: about 50 per cent. of the incoming freight or hardware was received and unloaded at the north shed entrance of the building, along the railroad tracks. The other fifty per cent. consisted of local shipments from factories, all of which was trucked from various freight depots in the city to the building, and unloaded through the south front doors on Main Street on to the first or main floor,

whence it was taken by an elevator at the south wall to the other floors for storage until shipped. The building contains two elevators, one at the south end, against the south wall, and about 50 feet west of the east wall of the building, and the other at the north end of the building, against the north wall, about 40 feet west of the east wall, the north elevator having an opening or door direct from the shaft into the shed. According to appellee's testimony, about ninety per cent. of outgoing shipments were handled by truck or wagon, owing to the fact that the company buys in large quantities and sells and ships out in small, shipments to customers being necessarily smaller than quantities bought by the company.

"According to their testimony, appellees used both entrances, the shed entrance at the north and the Main Street entrance at the south, for loading on to trucks or wagons their outgoing shipments, the *modus operandi* being described as follows: A truck would proceed down the steep 17½-foot roadway between the building and the old bridge to a point near the north end of the roadway, where it would be turned to the east under the bridge, and from that point backed up opposite to the east entrance to the shed, the freight being loaded from the shed onto the vehicle. The truck would then be driven back up the roadway to a point opposite the south or front door entrance, where it would again be wheeled to the east and then backed up to the curb for further loading, a good deal of the heavy merchandise being loaded at the north end. In loading trucks at the north end of the property, there was a two- or three-foot lift from the sidewalk to the bed of the truck, but at the south entrance, owing to the fact that there was an eighteen-inch depression of the street at the curb, the bed of the truck slanted toward the sidewalk, there being not so much to lift. It was testified that, under the old arrangement, it was possible to load two trucks at the north end and three trucks at the south end of the building at the same time. The goods loaded into trucks at the north end were usually such as were stored and kept

in the basement, while the goods loaded at the south end
were such as were kept on the main and higher floors,
the elevator at the north end being used chiefly for
elevating incoming goods to higher floors. The goods
for loading out at the north end were usually assembled
in the shed, the goods shipped from the south or main
floor entrance being assembled at the south end of the
main floor inside of the two south doors. The entire side-
walk east of the building, from the south doors to the shed
entrance on the north, was also used for the assembling
of goods during dry weather, as is shown by the photo-
graphs above referred to; and great quantities of goods
were also stored in the middle of Main Street under the
old bridge * * * * * *.

"The surroundings have been changed as follows:
The old steel and iron structure has been replaced by a
modern and permanently constructed concrete bridge,
with an easier grade or approach from Markham Street
north to the point where the bridge connects with Main
Street. This has necessitated the raising of the grade
of Main Street north of Markham to the bridge and the
widening of the bridge itself. * * * * The bridge
sidewalk actually begins at the south wall of the C. K.
Lincoln building and extends flush with the Lincoln and
Fones buildings to a point 29 feet north of the south wall
of the Fones building. At that point a flight of eight
concrete steps leads from the bridge sidewalk in front
of the Fones property down to the original or old side-
walk leading north along and east of the Fones building
to the railroad tracks. The raised sidewalk along the
south 29 feet of the Fones building is sufficiently higher
than the grade of the original sidewalk at that point to
make the new sidewalk 5 feet 7 inches above the main
floor at the south doors. The height of the ceiling above
the main floor is 14 feet.

"As stated, the sidewalk opposite this 29 feet of
the building is the bridge and Main Street sidewalk, and,
to accomplish this result, the west wall of the bridge
* * * * was curved to the east and brought into

the sidewalk 29 feet north of the south wall of the building. This resulted in cutting off and eliminating the old 17½-foot driveway formerly existing between the old bridge and the building, it being no longer possible to drive vehicles between the Fones building and the bridge, down to the north or shed entrance, for loading. To take care of this situation, the roadway on the east side of the bridge, between it and the Wait building, was very materially altered and improved. * * * * A narrow sidewalk borders the Wait building on the west, the Wait building being at the northeast corner of north Main and Elm Streets, this sidewalk running north for a distance of 51 feet. Between the curb of the sidewalk and the east wall of the bridge the roadway is 20.3 feet wide. After passing the point where the sidewalk ends, an additional space of 4.5 feet is added to the width of the roadway, making it 24.8 feet wide. This roadway has been paved with concrete, and its grade has been reduced from the original fifteen per cent. to a six per cent. grade. At a point down this east roadway, about 90 feet north of the north side of Elm Street, a large opening or arch has been made in and under the new bridge, for the purpose of enabling trucks and vehicles to pass from Main Street down east of the bridge, between it and the Wait building, and to drive under the bridge to the Fones building and its loading facilities on the west side of the bridge * * *.

"The roadway under the arch and clean over to the sidewalk along the east of the Fones building is paved with concrete, and, after passing out from under the arch to the west, in front of the Fones building, there is now a paved open space from the west wall of the bridge to the east property line of the Fones building, of 21 feet, this space being the space between the west wall of the bridge south of the archway and the Fones building, leading up to the staircase in the sidewalk. * * *

"The result is that, while the operations of the bridge district have shut off the access down the west

side of Main Street to the loading shed at the north end of the Fones building, yet the district has substituted therefor a new and improved roadway down east of the new bridge and under the arch, so as to enable trucks and vehicles to come down east of the bridge, turn west under the archway, and thus have what appellants claim to be easy and practicable access to the north end of the building.

"It is to be noted that, while the new sidewalk along the south 29 feet of the front of the Fones building has been elevated to a point 5 feet 7 inches above the main floor level, it leaves the building at the point 29 feet north of the south wall, turning on to the bridge. At this point the flight of concrete steps above referred to takes one from the new sidewalk down to the level of the old sidewalk, which is far below the level of the main floor, the old sidewalk from that point north to the railroad tracks sloping north along what is the basement of the building, and reaching a level with the basement floor at about the north end of the building.

"The west wall of the new bridge is about 12 feet nearer the property line than the west side of the old bridge. There is very little difference in the height of the two bridges. At a point opposite the two doors at the south end of the Fones building the grade of the new bridge is 2½ feet higher than that of the old. From that point the difference between the grade of the two bridges grows less and less, until, at a point opposite the north end of the building, the grade of the new bridge is only one foot higher than that of the old."

There was reference to a master, before whom proof was adduced by both parties, and the master made his report, fixing the damages at $27,500, to which report appellants filed exceptions. The court overruled the exceptions, and rendered judgment in favor of appellees for the recovery of the amount of the award.

It is the contention of appellees that the changes in the surroundings of the building have caused a com-

plete deprivation of the use of the building as a whole-sale store, and that now the best restoration that can be effected will be to confine its use to mere storage purposes, and that the amount of damages awarded by the chancery court does not more than compensate for the loss in value of the building. On the other hand, it is contended by appellants that, under the plan of restoration suggested by architects introduced by the commissioners, the building can still be used, with the proper facilities, as a wholesale business house, and that the damages awarded below are grossly excessive. Both sides introduced numerous witnesses as to value and as to the effect of the change in the usefulness and value of the building caused by the construction of the new bridge. There is no conflict in the testimony as to the changes that were made, but there is a wide difference of opinion as to the usefulness of the building now and the depreciation in its value.

The evidence adduced by appellees was to the effect that a wholesale business could not be successfully operated in the building under the restricted shipping facilities after the construction of the new bridge. According to the testimony, the north, or shed, entrance from the railroad track could be used only for shipping heavy goods kept in the basement, and that the shipping of all other goods on the main floor and the upper floors could only be conveniently handled out of the entrances on Main Street. The testimony adduced by appellants tended to establish the fact that, even though the driveway between the front of the building and the west side of the old bridge had been shut off from travel, there had been a substantial restoration of access to the building by widening and paving the twenty-foot street on the east side of the bridge and providing a paved archway which afforded access to the building. In addition to that, the evidence thus adduced tended to establish the fact that there could be substantial restoration of the shipping facilities by cutting double doors at a new place in the front on Main Street. It is unnecessary to state

in detail the various plans for restoration suggested by witnesses introduced by appellants.

There was a sharp conflict in the testimony of witnesses who gave testimony as to real estate values and the extent of depreciation. The testimony as to the original value of the building ranged all the way from $60,000 to $100,000, and the depreciation runs all the way from twenty to fifty per cent. of the original value. The owner of the building held it at a value of $77,500—carried the value at that sum on the books—and after the construction of the bridge, but before any steps were taken towards restoration, the building was sold on the market for $50,000. A fair consideration of the testimony, weighed in the light of the conflicting opinions of the various witnesses, warrants the conclusion that the building in its original condition was worth $77,500, and that its value was reduced by the construction of the new bridge to the sum of $50,000. The master, in his analysis of the testimony, seems to have given considerable weight to the fact that the building was sold in the market for $27,500 less than the original value, and he adopted that as the amount of the award.

Our conclusion is that the findings of the master are in accordance with the preponderance of the evidence. It seems clear to us that, from the standpoint of good business, the property, even with the best of restoration, is not available for ordinary business purposes otherwise than for storage purposes. Access to the building by customers is restricted to the eight-foot stairway running down from the sidewalk near the corner of the building. The front of the building is necessarily unattractive by reason of lack of access to it, and, while there is an approach to the building from the east side of the bridge and under the archway, it is a roundabout way to get to the building, and the testimony shows that it does not afford sufficient access to give proper shipping facilities. Conceding that each of the restoration plans suggested by witnesses introduced by appellant are feasi-

ble, the fact still remains that the building is isolated and its usefulness very much restricted, almost entirely so, as a business building, and to some extent even as a place of storage. Of course, it may be of value to the owners of adjoining property if the building be consolidated with other buildings, but the owners at the time the damage accrued are entitled to recover the depreciation in the value of their property, regardless of what it may be used for if consolidated with other buildings. Of course, the possibility of a sale to adjoining property owners would not be without probative force. But, when everything is considered, we are of the opinion that the master and the chancellor reached the correct conclusion in fixing the amount of the award. The evidence fully sustains the original value at $77,500, and it appears from the testimony that the owner, after the damage accrued, and after putting the property on the market for sale, and after reasonable effort, made a sale at the price of $50,000. Besides that, there is plenty of evidence in the record to show that $50,000 is a fair value for it in its damaged condition. The result of our views is that the decree is correct.

Other questions involved in the appeal have been disposed of in the decisions rendered today involving damage to property of other owners.

Affirmed.